IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICHARD F. WEAVER, JR,

        Plaintiff,

v.

BENNETTE NORTON/TRCI's TLC
COMMITTEE; ROGER CONLEY;
CHRISTOPHER DiGIULIO;
LINDA GRUENWALD; STEVE
SHELTON; DAROTH WETTLAUFER;
BRIGITTE WHELAN,

        Defendants.

No. 2:16-cv-02311-HZ

OPINION & ORDER

Richard F. Weaver, Jr.
8855258
Two Rivers Correctional Institution

1- OPINION & ORDER

82911 Beach Access Rd.
Umatilla, OR 97882

    *Pro Se* Plaintiff

Ellen F. Rosenblum
Attorney General
Nathaniel Aggrey
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301

    Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiff Richard Weaver brings this action under 42 U.S.C. § 1983, alleging violations of his Eighth Amendment right to be free from cruel and unusual punishment. Defendants include: Two Rivers Correctional Institution's ("TRCI") Therapeutic Level of Care Committee ("TLC Committee"); the individual members of the TLC Committee (Roger Conley, Christopher DiGiulio, Linda Gruenwald, Dr. Steve Shelton, Daroth Wettlaufer, and Brigitte Whelan[1]); and Oregon Department of Corrections ("ODOC") physician Dr. Bennette Norton (collectively "Individual Defendants"). Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs in treating his bilateral ulnar neuropathy. Before the Court is Defendants' Motion for Summary Judgment [50]. The Motion is GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiff is currently in ODOC custody and incarcerated at TRCI in Umatilla, Oregon. Plaintiff suffered from ulnar neuropathy in both elbows. Shelton Decl. ¶¶ 3, 8, 40, ECF 51; Weaver Decl. Ex. A, at 7, ECF 63. "The ulnar nerve runs down the entire length of the arm and

---

[1] The Court does not use "Dr." or "Drs." when referring to individual TLC Committee members other than Dr. Shelton because it is unclear from the record and the parties' briefs whether those individuals are also doctors.

helps control the muscles in the forearm and hand." Shelton Decl. ¶ 6. The ulnar nerve is especially susceptible to entrapment at the elbow because of fluid buildup which may occur there. *Id.* If non-surgical treatments fail, such as anti-inflammatory medication, use of a splint or sling, and physical therapy, then surgery may be necessary. *Id.* at ¶ 7. In this case, Plaintiff's ulnar nerves were pinched at the elbows, causing soreness, numbness, and weakness in his arms and hands. *Id.* Ulnar nerve anterior transposition surgeries were performed on both of Plaintiff's elbows and cubital tunnel release was performed on his left elbow. *Id.* at ¶¶ 8, 40. Ulnar nerve transposition is a procedure "to move the ulnar nerve so that it doesn't stretch over the bony parts of the elbow joint." *Id.* at ¶ 7. Cubital tunnel release "is a procedure to remove parts of the compressed tube that the nerve passes through in the elbow." *Id.* Plaintiff claims that Defendants failed to provide adequate post-operative care to his right elbow and that they unreasonably delayed performing surgery on his left elbow.

## I.     Medical Care of Plaintiff's Right Elbow

On January 6, 2016, outside medical provider Dr. Robert Hansen performed ulnar nerve transposition surgery on Plaintiff's right elbow at West Idaho Orthopedics and Sports Medicine. *Id.* at ¶ 8; Weaver Decl. Ex. A, at 10–11. During surgery, Plaintiff suddenly awoke and "forcefully jerked" his arm "with a pop and tearing being heard," tearing the ulnar collateral ligament. Weaver Decl. Ex. A, at 11. According to Dr. Hansen, the "[t]he ligament itself looked pretty strong" and he repaired it, stabilizing the elbow by the end of the procedure. *Id.* After the procedure, a soft wrap and a splint were applied to Plaintiff's arm and he was returned to the recovery room in stable condition. *Id.* Plaintiff was transported back to TRCI and monitored by medical staff there. Shelton Decl. ¶ 8. Medical staff reminded Plaintiff to elevate his arm and wear his splint and sling at all times. *Id.*, Attach. 1, at 3.

During the night after surgery, Plaintiff bled through his dressing. Weaver Decl. Ex. A, at 15. The following day, he was given new dressing, his splint was replaced, and he was given pain medication. *Id.* On January 11, Plaintiff was evaluated by TRCI medical staff and advised to keep his arm in a sling. He was also given pain medication. *Id.* On January 14, medical staff evaluated Plaintiff again and he was fitted with a new sling and instructed on its proper use. Shelton Decl. ¶ 10, Attach. 1, at 2. From January through July of 2016, Plaintiff was: evaluated by medical staff on multiple occasions; given a new sling, new splint, and elbow brace; prescribed pain medication; and instructed on how to conduct self-guided physical therapy exercises. Shelton Decl. ¶¶ 11–24.

## II. Medical Care of Plaintiff's Left Elbow

On June 2, 2015, ODOC physician Dr. Garth Gulick diagnosed Plaintiff with mild ulnar neuropathy and proposed an ulnar nerve study. Weaver Decl. Ex. A, at 1. On July 21, 2015, Dr. Gulick recommended medical imaging for bilateral ulnar nerve neuropathy. *Id.* at 2. On August 7, 2015, after an EMG was taken of Plaintiff's upper extremities, outside medical provider Dr. Stephen Asher concluded that Plaintiff had bilateral moderate ulnar neuropathy. *Id.* at 3–4. On August 12, 2015, Dr. Gulick recommended that the TLC Committee approve nerve transposition surgery based on Plaintiff's bilateral ulnar neuropathy. *Id.* at 6–7. Dr. Hansen concurred with Dr. Gulick's findings. *Id.* The TLC Committee approved the recommendation on August 26, 2015. *Id.*

On November 20, 2015, Dr. Hansen examined Plaintiff and concluded that he had significant ulnar neuropathy. *Id.* at 9. Dr. Hansen recommended surgical release transposition of the ulnar nerve. *Id.* He wrote: "Patient is sent [sic] for current numbness aching now weakness and pain in both upper extremities *left is worse*." *Id.* at 8 (emphasis added). Dr. Hansen further

noted that his findings were "consistent with ulnar neuropathy *worse on the left side* than the right side" and he recommended surgical release transposition of the ulnar nerve. *Id.* at 9 (emphasis added). Under the "Plan" heading, Dr. Hansen explained:

> I think the patient would benefit from ulnar nerve transposition. Sometimes this does not completely relieve the symptoms and it is possible he may have some persistent numbness and/or weakness in one or both hands this was discussed with him. He is having some proceed [sic] with surgery with this understanding. He will be scheduled for release and *transposition of the left ulnar nerve in this much as this is most symptomatic.*

*Id.* at 9 (emphasis added).

Dr. Hansen's January 6, 2016 operative report describing Plaintiff's surgery contains some contradictions. *Id.* at 10–11. Dr. Hansen wrote that Plaintiff was diagnosed with ulnar neuropathy in the *right arm*. *Id.* at 10. However, under "Procedures Performed" he wrote: "Release and anterior transposition of *left ulnar nerve* and repair of *left medial ulnar collateral ligament* at the elbow." *Id.* at 10 (emphasis added). The parties do not dispute that Dr. Hansen performed surgery on Plaintiff's right elbow, not his left. Dr. Hansen compounded this error when he further described performing surgery on Plaintiff's left elbow. *Id.* It is unclear from the record why Dr. Hansen performed surgery on Plaintiff's right elbow even though he recommended surgery on the left first. It is also unclear whether Dr. Hansen accidentally wrote "left" when he meant "right" or vice versa.

In any event, Plaintiff received surgery on his right elbow in January of 2016 and he received post-operative care through at least July of 2016. While Plaintiff was receiving post-operative care on his right elbow, he repeatedly reported pain in his left elbow and requested a second surgery. Weaver Decl. Ex. B, at 6–12. For example, on May 6, 2016, Plaintiff requested surgery on his left arm. *Id.* at 2. On May 9, he complained generally about nerve pain and

requested a new pain medication. *Id.* at 3. On May 31, Plaintiff complained to ODOC again, repeating his request for surgery on the left arm. *Id.* at 6. On June 10, 2016, Plaintiff asked ODOC to schedule surgery on his left arm. *Id.* at 8–9. He reiterated that request again on July 18 and 28. *Id.* at 10–12.

On August 18, 2016, Dr. Norton examined Plaintiff. Shelton Decl. ¶ 25. In response to Plaintiff's requests for a second surgery on his left elbow, Dr. Norton told him that only surgery on the right had been approved; however, Dr. Norton scheduled another evaluation of Plaintiff's left elbow. *Id.*, Attach. 1, at 9[2]. Dr. Norton examined Plaintiff once more and referred him to Kadlee Neuroscience Center for a bilateral EMG, which was taken on October 12, 2016. Weaver Decl. Ex. A, at 26. Dr. Turner took the EMG and wrote that Plaintiff had mild to moderate ulnar neuropathy at the left elbow. *Id.* at 27; Shelton Decl. Attach 1, at 34.

On November 15, 2016, Dr. Norton sent a letter to the TLC Committee proposing surgery on Plaintiff's left elbow. Weaver Decl. Ex. A, at 32. The TLC Committee members that reviewed the request by telephone included Defendants DiGiulio and Dr. Shelton. *Id.* The committee recommended an orthopedic consult on Plaintiff's Right elbow, then to bring Plaintiff back for consideration of the left. *Id.*

On February 27, 2017, Dr. Norton evaluated Plaintiff again and noted that further examination of Plaintiff's left elbow had been scheduled. *Id.* at ¶ 35, Attach. 1, at 16. On May 30, 2017, Dr. Norton scheduled a neurosurgical consult as to Plaintiff's left elbow. *Id.* at ¶ 38,

---

[2] Dr. Shelton wrote in his declaration that on August 18, 2016, Plaintiff met with Dr. Norton and requested surgery on his left elbow. Shelton Decl. ¶ 25. Dr. Shelton then wrote: "Dr. Norton informed Weaver that only one elbow surgery was approved at the present time. Dr. Norton also informed Weaver that the past most recent EMG on the left elbow performed on August 7, 2015, was negative for neuropathy." *Id.* However, upon the Court's review of the record, the conclusion section of the August 7, 2016 EMG study clearly states that Plaintiff had "[b]ilateral moderate ulnar neuropathies located at or above the cubital tunnels." Shelton Decl., Attach. 1, at 23. The conflict between Dr. Shelton's Declaration and the medical record bolsters the Court's decision to deny summary judgment regarding Plaintiff's § 1983 claim with respect to his left elbow. *See Infra* Part II.

Attach. 1, at 17. On July 10, 2017, the TLC Committee approved surgical treatment of Plaintiff's left elbow. *Id.* at ¶ 39, Attach. 1, at 18.

On November 21, 2017, Dr. Joshua Bales of Kadlec Regional Medical Center performed ulnar nerve transposition and cubital tunnel release procedures on Plaintiff's left elbow. *Id.* at ¶ 40, Attach. 1, at 43–44. On January 17, 2018, a sonographic evaluation of Plaintiff's left elbow produced normal results. *Id.* at ¶ 41, Attach. 1, at 38.

### III.   Procedural History

As early as October 11, 2015, Plaintiff began filing formal grievances with ODOC alleging that Defendants negligently failed to provide adequate post-operative treatment of his right elbow. *See generally*, Weaver Decl. Ex. C, at 1–76. Plaintiff filed his original complaint before this Court on December 12, 2016. *See* Compl., ECF 2. The Court dismissed Plaintiff's original complaint on January 31, 2017. *See* Op. & Order, Jan. 31, 2017, ECF 8. Plaintiff's amended complaint was filed on July 5, 2017. *See* Am. Compl., ECF 15.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade*

*Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (quoting *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

## DISCUSSION

Defendants move for summary judgment on Plaintiff's §1983 claim on several grounds. First, Defendants argue that Plaintiff failed to demonstrate that they were deliberately indifferent to his serious medical needs. Second, Individual Defendants claim qualified immunity bars Plaintiff's claims against them. Third, Defendants contend that Plaintiff's claims are also barred by sovereign immunity under the Eleventh Amendment. Fourth, Individual Defendants argue that they cannot be held liable under a respondeat superior theory of supervisory liability. To the extent that Plaintiff's § 1983 claim could be construed to encompass a tort claim for medical negligence, Defendants argue that Plaintiff failed to provide the required notice under the Oregon Tort Claims Act ("OTCA").

To establish an Eighth Amendment claim, Plaintiff must show that he had a "serious medical need" and that Defendants were "deliberately indifferent" to that need. *Lolli v. Cty. of Orange*, 351 F.3d 410, 418–19 (9th Cir. 2003). "[A] serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain . . . ." *Id.* at 419 (quoting *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002)). Deliberate indifference may be satisfied by showing: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need[;] and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith*, 974 F.3d 1133, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*,

104 F.3d 1133 (9th Cir. 1997)). "Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Id.* (quoting *McGuckin*, 974 F.3d at 1059). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate difference is a high legal standard. A show of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) (citations omitted).

I. **Medical Care of Plaintiff's Right Elbow**

Plaintiff contends that Defendants were deliberately indifferent in providing post-operative treatment to his right elbow in three ways. First, he argues that Defendants provided him with an inadequate sling which exacerbated his injury. Second, Plaintiff claims that Defendants should have prescribed physical therapy with a physical therapist. Lastly, Plaintiff argues that Defendants prescribed ineffective and inadequate pain medications. In response, Defendants argue that the medical record conclusively establishes that they were responsive to Plaintiff's medical needs and that he received constitutionally adequate medical treatment. The Court will discuss each claim in turn.

A. *Use of a Sling*

After surgery, Plaintiff was given a sling and splint to keep his elbow straight, especially while he slept. Shelton Decl. ¶¶ 7–8. Plaintiff claims that Defendants gave him an undersized sling with a faulty Velcro strap that repeatedly popped off, causing his arm to drop. Weaver Decl. at p. 5. Based on the treatment record, Plaintiff has not raised a genuine dispute of material fact as to Plaintiff's sling use. Defendants have established that they were not deliberately

indifferent to Plaintiff's serious medical needs. On January 7, 2016, the day after Plaintiff received ulnar transposition surgery on his right elbow, outside medical provider Dr. Craig Jamison sent the following email to Dr. Hansen regarding Plaintiff's recovery:

> I received a phone call form Dr. Koltes today. Apparently this patient had some bleed through of his dressing overnight. He was apparently also agitated and at some point pulling his dressing off. He was complaining of pain. Nursing at the facility put a new dressing back in place. This was evaluated and improved by Dr. Koltes today. His splint is back in place. Pain medication adjustment. We will plan to see him earlier than scheduled. Likely tomorrow to make sure that things are properly protected.

Weaver Decl. Ex. A, at 15. On January 11, Plaintiff was evaluated by medical staff and reminded to keep his arm in a sling. Shelton Decl. ¶ 9, Attach. 1, at 3. On January 14, medical staff evaluated Plaintiff again, fitted him with a new sling, and showed him how to use it. *Id.* at ¶ 10, Attach. 1, at 2. On January 15, Plaintiff told medical staff that he took the sling off at night to sleep and elevated his arm on a pillow. *Id.* at ¶ 11, Attach. 1, at 2. Once more, medical staff reminded Plaintiff to keep his sling on "at all times" and not to take it off at night. *Id.* Medical staff observed that Plaintiff was not wearing his sling on January 17, 22, and 25. *Id.* at ¶ 12, Attach. 1, at 2–3.

On January 26, 2016, Dr. Hansen examined Plaintiff, noting: "Postoperative course was also complicated by the fact that [Plaintiff] indicates that he was placed in a sling at the prison for [sic] the Velcro was very weak gave way his arm fell with him feeling a pop increased pain and then subsequent bleeding on his dressing." Weaver Decl. Ex. A, at 16. On January 27, Dr. Hansen gave Plaintiff a soft padded wrap and a new splint. Shelton Decl. ¶ 13, Attach. 1, at 1; Weaver Decl. Ex. A, at 16–17. An MRI of Plaintiff's right elbow was taken, and Dr. Hansen recommended that Plaintiff wear a hinged brace for six to eight weeks. Weaver Decl. Ex. A, at 17. Dr. Hansen examined Plaintiff again on February 5. He wrote: "the swelling is down

sufficiently and the incision is sufficiently healed I think we can go ahead and place him in the hinged elbow brace." *Id.* at 18. On March 4, Dr. Hansen approved Plaintiff for use of an elbow brace for four weeks. *Id.* at 19. Dr. Hansen noted that Plaintiff had no similar episode where his arm slipped out of the sling. *Id.* at 19. During an April 1 medical examination, Plaintiff informed Dr. Hansen that he had been wearing his brace intermittently because it was causing him pain. Shelton Decl. Attach. 1, at 30. Dr. Hansen noted that the "[r]ight elbow examination shows well healed wound," Plaintiff's elbow joint felt stable, and that use of the splint should be discontinued. *Id.* Dr. Hansen recommended an EMG study in the next six months. *Id.* Subsequent medical records showed that Plaintiff's right elbow was healing well and his elbow's range of motion and motor functioning were normal. Shelton Decl. ¶¶ 24–26, 28–32.

Even when construing these facts in the light most favorable to Plaintiff, the Court finds that Plaintiff cannot establish deliberate indifference based on his post-operative use of a sling. As the record demonstrates, Defendants were responsive to Plaintiff's pain complaints. Medical staff replaced Plaintiff's sling and splint on multiple occasions and his condition was closely monitored. Further, Plaintiff was observed not wearing his sling on at least three occasions shortly after his surgery, despite repeated reminders from medical staff. Early episodes of Plaintiff's arm slipping out of his sling were remedied by a replacement sling and did not recur. In sum, regarding the right elbow, Plaintiff cannot show that Defendants took any purposeful act that harmed him or failed to respond to his medical needs.

**B.     *Physical Therapy***

Next, Plaintiff contends that Defendants were deliberately indifferent by refusing to prescribe physical therapy treatment sessions with a physical therapist. Plaintiff also claims that he never received any instruction on self-care following surgery. Weaver Decl., at p. 6. On

February 5, 2016, approximately a month after Plaintiff's surgery, he was approved to begin range-of-motion exercises. Shelton Decl. ¶ 15, Attach. 1, at 13. On March 4, Dr. Hansen evaluated Plaintiff and told him to continue self-directed strength and conditioning exercises after his four-week use of an elbow brace was complete. *Id.* at ¶ 19, Attach. 1, at 31. Dr. Hansen also wrote that he thought Plaintiff "would benefit from strengthening and rehabilitation time therapy if possible visit with the therapist for instruction from rehabilitation therapy and exercise program in 4–6 weeks would be helpful." *Id.*

Here too, Plaintiff cannot establish deliberate indifference. Even when construing the facts in the light most favorable to Plaintiff, the record demonstrates that Defendants were responsive to Plaintiff's medical needs. Immediately after Plaintiff's surgery, his elbow was immobilized with splints, slings, and an elbow brace. The medical record shows that Plaintiff was approved to begin range of motion exercises once his elbow brace came off. As discussed above, subsequent examinations and medical imaging of Plaintiff's right elbow showed that it was healing well and Plaintiff's motor functioning and range of motion returned. Moreover, Plaintiff cannot show that he was harmed because Defendants did not prescribe physical therapy sessions, nor can he show that such treatment was medically necessary to avoid any significant injury or wanton infliction of pain.

C. *Pain Medication*

Third, Plaintiff claims that Defendants violated his Eighth Amendment right by prescribing ineffective pain medication and by denying Plaintiff's requests for medication. *See* Pl.'s Surreply 1–2, ECF 65. Plaintiff was first prescribed Cymbalta on the day he underwent surgery on his right elbow. Weaver Decl. Ex. A, at 12–15. The following day, January 7, 2016, Plaintiff's pain medication was adjusted in response to his pain complaints. Weaver Decl. Ex. A,

at 15. On January 17, Plaintiff expressed to medical staff that he was upset his pain medication prescription had expired. Shelton Decl. Attach. 1, at 2. On February 17, Plaintiff was given a new prescription for Cymbalta to manage his nerve pain. *Id.* at 6. On July 16, 2016, Plaintiff asked Dr. Norton to prescribe gabapentin because Cymbalta was not alleviating his pain. Shelton Decl. ¶ 24, Attach. 1, at 7. Dr. Norton was concerned that Plaintiff was engaging in drug-seeking behavior and he did not believe that clinical findings supported prescribing gabapentin. *Id.* Plaintiff's ODOC progress notes show that subsequent medical imaging produced normal results and swelling in Plaintiff's right elbow was reduced. Shelton Decl. Attach. 1, at 10–11.

Further physical examinations of Plaintiff showed that, contrary to his complaints of increased pain, he performed well on strength, grip, and range of motion exercises and "no facial grimacing [was] noted." *Id.* at 8–11. On December 22, 2016, outside medical provider Dr. Richard Carpenter wrote to Dr. Norton that, upon his examination, Plaintiff "continues to have irritability of the ulnar nerve" but he also "definitely has function of all intrinsics, which is supplied by the ulnar nerve." *Id.* at 35. Dr. Carpenter also wrote the following:

> He already is quite verbal about litigation, and I honestly do not think there is a whole lot that I can do to make his life better and any sort of further surgical intervention would probably not make him satisfied with the end result, so I really do not think that I need to see him again.

*Id.* at 36. On February 8, 2017, Dr. Norton Prescribed one year of Cymbalta for Plaintiff's nerve pain. *Id.* at 37.

The Court finds that Plaintiff's course of treatment regarding pain medication does not establish that Defendants were deliberately indifferent. From the outset, Plaintiff was prescribed Cymbalta to help him manage his pain. When Plaintiff reported increased pain shortly after surgery, his dosage was adjusted. The record supports Plaintiff's assertion that his Cymbalta

13- OPINION & ORDER

prescription ended, and for a short period, Plaintiff was not receiving any pain medication. However, the record also shows that as Plaintiff's right elbow healed through treatment, his functionality returned and swelling reduced. In light of the medical record as a whole, such a brief lapse is insufficient to establish deliberate indifference. Moreover, when Plaintiff claimed that Cymbalta was no longer working and asked for Gabapentin, Dr. Norton conducted a physical examination of Plaintiff and found that his requested prescription change was not supported by his condition.

In sum, Defendants were responsive to Plaintiff's pain complaints. Plaintiff must meet a high bar in order to establish deliberate indifference under the Eighth Amendment. While Plaintiff was dissatisfied with aspects of Defendants' post-operative treatment of his right elbow, he has failed to make the requisite showing that some purposeful act or failure to respond on Defendants' part caused him a serious injury or wanton pain. Plaintiff cannot make such a showing on this record. Accordingly, the Court grants summary judgment in Defendants' favor on Plaintiff's § 1983 claim to the extent that it is based on Defendants' treatment of his right elbow.[3]

## II. Medical Care of Plaintiff's Left Elbow

Next, Plaintiff claims that Defendants were deliberately indifferent in delaying treatment of his left elbow for two years. As discussed above, Plaintiff was first diagnosed with ulnar nerve neuropathy in his left elbow in July of 2015. Plaintiff did not receive surgery on his left elbow until November of 2017. Plaintiff must demonstrate that Defendants "acts or omissions" were

---

[3] Defendants also move for summary judgment on Plaintiff's purported state law tort claim for medical negligence on the ground that Plaintiff's tort claim notice was untimely under the OTCA. O.R.S. § 30.275(1). Plaintiff's tort claim notice is based solely on his alleged injury to the right elbow. For the reasons stated above regarding Plaintiff's § 1983 claim, the Court also dismisses Plaintiff's tort claim. Plaintiff has failed to raise a genuine issue of material fact regarding Individual Defendants' alleged negligence in providing post-operative treatment to his right elbow. Therefore, summary judgment is granted in Defendants' favor on this claim.

14- OPINION & ORDER

"sufficiently harmful to evidence deliberate indifference." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Once more, "mere malpractice, or even gross negligence, does not suffice." *Id.* A delay in treatment violates the Eighth Amendment only if it "caused substantial harm." *Id.* at 1335. (citing *Shapley v. Nevada Bd. Of State Prison Com'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).

The Court finds that Plaintiff has created a genuine dispute of material fact as to whether Individual Defendants were deliberate indifferent to his severe medical needs regarding his left elbow. Between July and November of 2015, Drs. Gulick and Hansen diagnosed Plaintiff with bilateral ulnar neuropathy and found that his condition was worse on the left side. Weaver Decl. Ex. A, at 1–9. Defendant Dr. Shelton, a member of the TLC Committee, reviewed Dr. Gulick's report. *Id.* On November 20, 2015, Dr. Hansen recommended surgery on the left arm first. *Id.* at 9. Additionally, from July of 2015 to July 2017, Dr. Norton and ODOC staff treating Plaintiff knew that he suffered from ulnar neuropathy in the left arm. Plaintiff was diligent in reiterating his pain complaints and requests for surgery during that two-year period. Defendants have not proffered an explanation for the delay sufficient to warrant summary judgment in their favor.

Plaintiff, as a pro se litigant, has understandably struggled to identify which particular individuals disregarded his requests and complaints. Upon reviewing the medical record, the Court has found ample evidence showing Drs. Norton and Shelton's longstanding knowledge of Plaintiff's condition. The Court also located records indicating that Defendant DiGiulio was aware of Plaintiff's left-elbow condition by at least April of 2016. *Id.* at 23–25, Further, On November 16, 2016, Plaintiff wrote a letter to Dr. Norton requesting surgery on his left elbow. Defendant Conley reviewed the request and wrote in response that the TLC Committee "will

review [Plaintiff's] left ulnar issues after the right elbow consultation." Weaver Decl. Ex. B, at 19.

Plaintiff produced additional documents showing that other TLC Committee members were made aware of left-elbow condition and pain complaints at least a year before he received surgery. It is unclear, however, based on the illegible signatures on those documents, which individual TLC Committee member reviewed Plaintiff's medical records and determined not to approve treatment. Out of an abundance of caution and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that he has raised a genuine factual dispute regarding individual TLC Committee members' deliberate indifference to his serious medical need. Accordingly, the Court denies summary judgment on Plaintiff's § 1983 claim against Individual Defendants acting in their individual capacities to the extent that the claim is based on delayed treatment of his left elbow.

### III. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. The qualified immunity analysis asks two questions. First, whether the facts, when taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. *Grant v. City of Long Beach*, 315 F.3d 1081, 1089 (9th Cir. 2002), *opinion amended on denial of reh'g*, 334 F.3d 795 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second question is whether the constitutional right at issue was "clearly established." *Saucier*, 533 U.S. at 202. This means that the constitutional right was known to the official as existing at the time of the alleged violation. *Id.* at 202. Courts may decide which prong of the qualified immunity analysis to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As discussed above, the Court has determined that, when viewing the facts in the light most favorable to Plaintiff, there is a genuine factual dispute regarding whether Individual Defendants were deliberately indifferent to Plaintiff's severe medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. *See Supra* Part II. The Court is therefore convinced that the first prong of the qualified immunity analysis has been satisfied.

Turning to whether the right was clearly established, there are Ninth Circuit cases which establish that much shorter delays in providing medical treatment violated prisoners' Eighth Amendment rights. *See e.g. Jett*, 439 F.3d at 1096–1097 (reversing summary judgment granted in the government's favor where the individual physician defendant knew of the plaintiff's fractured thumb and failed to take an x-ray for nearly two months); *Hunt v. Dental Dep't*, 865 F.2d 198, 199–201 (9th Cir. 1989) (three-months delay in replacing dentures constituted an Eighth Amendment violation). Here, the record shows that Dr. Norton and TLC Committee members were aware of Plaintiff's left-elbow ulnar neuropathy for at least a year before Plaintiff received treatment. The record also shows that Plaintiff continually complained of pain, numbness, and loss of function during that time. When considering Ninth Circuit precedent and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff's right not to have treatment delayed for two years while he suffered from ulnar neuropathy was clearly established.

## V.     Sovereign Immunity

The Court agrees with Defendants that officials acting within their official capacities cannot be sued under § 1983 because they are not "persons" within the meaning of the statute. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials

literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Accordingly, Plaintiff's claims are dismissed to the extent that they are against Individual Defendants in their official capacities. For the same reason, Plaintiff's § 1983 claim against the TLC Committee itself is also dismissed.

The Court further agrees with Defendants that § 1983 does not permit liability under a respondeat superior theory. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978). There is no respondeat superior liability under § 1983; rather, a plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "A supervisor is liable under § 1983 for a subordinate's constitutional violations 'if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.'" *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (quoting Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989)). Accordingly, Plaintiff's claims are dismissed to the extent that they are based on Individual Defendants' subordinates' activities.

//
//
//
//
//
//
//
//

## CONCLUSION

Defendants' Motion for Summary Judgment [50] is GRANTED in part and DENIED in part. Summary judgment is GRANTED with respect to Plaintiff's § 1983 claim regarding Plaintiff's right elbow. The Motion is also granted on Plaintiff's § 1983 claim regarding the left elbow to the extent that the claim is against Individual Defendants in their official capacities and/or roles as supervisors. The Motion is GRANTED regarding Plaintiff's state law negligence claim. The Motion is DENIED regarding Plaintiff's § 1983 claim against Individual Defendants acting in their individual capacities regarding treatment of Plaintiff's left elbow.

Dated this 4 day of September, 2018.

*/s/ Marco Hernández*
MARCO A. HERNÁNDEZ
United States District Judge